**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AMY INGANDELA,<br><br>       Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social<br>Security,<br><br>       Defendant. | Civil Action No. 20-08033 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Before the Court is Plaintiff Amy Ingandela's ("Plaintiff") appeal of Administrative Law Judge Scott Tirrell's (the "ALJ") decision denying Plaintiff's application for disability insurance benefits ("DIB") based on the ALJ's determination that Plaintiff was not disabled under the Social Security Act (the "Act"), 42 U.S.C. §§ 1381 *et. seq.* (ECF No. 1, Compl.).  Plaintiff argues that the ALJ erred in finding that she did not have severe impairments of obesity, sleep apnea, gastritis, gastroenteritis, and colitis, and that Plaintiff had not satisfied the Paragraph B criteria requirements associated with Listings 12.04, 12.06, and 12.11.  Additionally, Plaintiff argues that the residual functional capacity ("RFC") determination was not grounded in sufficient factual evidence.

For the reasons set forth herein, the Commissioner of Social Security's (the "Commissioner") decision denying benefits is **VACATED** and the Court remands this matter for further proceedings.

# I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on August 1, 1969, and she was 46 years old at the alleged disability onset date of March 1, 2016.  (Administrative Record ("A.R.") 22.)  Plaintiff has two college degrees and has past relevant work as a banquet waitress, server, formal waitress, head school cafeteria cook, and pantry chef or garde manger.  (A.R. 21, 44, 79-80).

Plaintiff protectively filed applications for disability benefits and supplemental security income on May 10, 2016 and May 18, 2016, alleging disability due to multiple impairments, including bipolar disorder, anxiety disorder, attention deficit hyperactivity disorder (ADHD), asthma, and degenerative disc disease of the cervical and lumbar spine.  (A.R. 13.)  Plaintiff's applications were denied initially and upon reconsideration.  (A.R. 161-66.)  Following these denials, Plaintiff was granted a hearing before the ALJ, which was held on October 23, 2018.  (A.R. 27-85.)  After the hearing, the ALJ issued a written decision on March 6, 2019, denying disability under the relevant statutes.  (A.R. 7-29.)  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on May 4, 2020, and as a result, Plaintiff filed the instant Complaint on July 1, 2020.  (A.R. 1-6; ECF No. 1.)

## A.     Review of Physical Records[1]

Between 2014 and 2018, the record demonstrates that Plaintiff sought treatment for a variety of ailments from numerous sources and facilities, including the University Medical Center of Princeton at Plainsboro, Robert Wood Johnson Medical Center, St. Peter's University Hospital, and several other treating physicians.  In July 2014, Plaintiff was treated at the University Medical

---

[1]     Given the extensive and voluminous nature of Plaintiff's medical records, and, more importantly, because Plaintiff's physical impairments are not critical to the Court's decision to remand this case for further proceedings, I only briefly summarize Plaintiff's physical health records.

Center of Princeton at Plainsboro after suffering an acute episode of syncope while at work. (A.R. 423-34.) According to the discharge report, Plaintiff suddenly felt "hot, sweaty, and lightheaded, and felt her eyes fluttering with bright flashing in her eyes, at which point she lost consciousness." (A.R. 433.)  Plaintiff was admitted for two days, citing blurry vision, headache, neck pain, lightheadedness, bowel or urinary incontinence, tongue biting, auras, numbness, tingling and weakness before the episode.  (*Id.*)

Two years later, in August 2016, Plaintiff presented to Kamath Sudha, M.D., her treating physician at the time, for a progress assessment. (A.R. 515-555.)  Plaintiff stated that two months prior to the examination, she had passed out and felt numbness in her left arm. (*Id.*)  While Plaintiff believed it to be a heart attack or stroke, no medical evidence exists in the record to confirm that claim. (*Id.*)  Dr. Sudha referred Plaintiff to cardiology based upon her shortness of breath. (*Id.*)  In addition, Dr. Sudha identified a myriad of issues afflicting Plaintiff, including, but not limited to, anxiety, depression, headaches, shortness of breath, weakness, and arthritis. (A.R. 524.)  Dr. Sudha did not identify any gastrointestinal issues at the time. (*Id.*)

Between November 2016 and May 2017, Plaintiff was also treated at Robert Wood Johnson Medical Center.  On one occasion, in April 2017, Plaintiff sought treatment at Robert Wood Johnson Medical Center's Emergency Department for diffuse abdominal pain. (A.R. 960-990.)  Sometime prior to Plaintiff's admission, it appears that she had undergone laparoscopic surgery because the treatment notes indicate that the incision from the surgery was intact. (*Id.*)  Notably, records from this visit show that Plaintiff had presented with uncontrolled postoperative pain and drug seeking behavior. (*Id.*)  Specifically, treatment reports indicate that Plaintiff jumped with pain when touched in the right lower quadrant of her abdomen; however, did not appear in pain when her bed was accidentally bumped. (*Id.*)  One month later, in May 2017, Plaintiff had a

CT scan of her abdomen at St. Peter's University Hospital, which revealed diverticulosis of the bowel without evidence of diverticulitis, as well as some mild edema of the lower rectus musculature. (*Id.*)

In January 2018, Plaintiff returned to St. Peter's Hospital, complaining of a cough and extreme fatigue. (A.R. 816-33.) However, treatment notes from that visit also indicate that she had no shortness of breath, significant weight loss, palpitations, abdominal pain, vomiting, or diarrhea. (*Id.*) Moreover, Plaintiff reported no dizziness, headaches, depression, or sleep disturbances. (*Id.*) According to the records, she appeared active, alert, and fully oriented. (*Id.*) Then, in February 2018, Plaintiff underwent pulmonary function testing at St. Peter's Hospital, which revealed a "borderline reduction in the FEV1/FVC ratio and scooping of the expiratory limb, suggestive of borderline obstruction." (A.R. 17.) Three months later, in May 2018, Plaintiff was treated at Saint Peter's Adult Family Health Center for a follow-up consultation regarding her chronic diarrhea. (A.R. 807.) That same month she also underwent a colonoscopy, which revealed gastroenteritis, colitis, and diverticulosis without perforation or abscess. (A.R. 864.)

### B.    Review of Mental Health Evidence

In July 2014, when Plaintiff was treated for the acute episode of syncope at the University Medical Center of Princeton at Plainsboro, she was secondarily diagnosed with bipolar disorder, major depression, asthma, and rhabdomyolysis. (A.R. 433.) Indeed, the discharge report states that Plaintiff presented with "multiple psych conditions." (*Id.*)

Almost two years later, in May 2016, Plaintiff went to Princeton Behavioral Health (PBH) for worsening depression, anxiety, and passive suicidal ideation triggered by her recent unemployment. (A.R. 476.) At that time, Plaintiff stated that she last worked part-time as a waitress in April 2016, and that she was volunteering at a dog rescue facility. (A.R. 490.) Based

on her addiction history, which includes alcohol and marijuana, Plaintiff was eligible for American Society of Addiction Medicine level 2 intensive care for eight to ten weeks. (A.R. 496.) She received a Global Assessment of Functioning (GAF) score of 35, was admitted for acute partial hospitalization, and was diagnosed with bipolar disorder, cannabis dependence, post-traumatic stress disorder, and alcohol dependence. (A.R. 471, 475.) Despite these diagnoses, however, Plaintiff was discharged from PBH four days after admission, because she had several medical and dental issues that needed to be addressed. (A.R. 471.) Upon discharge, Plaintiff planned to continue the 12-step program work through Catholic Charities while addressing her unspecified medical and dental issues, and she agreed that she would return to PBH when she was ready to fully commit to an acute partial hospitalization program. (*Id.*)

Several months later, in October 2016, Emmanuel Hriso, M.D., found that Plaintiff had impaired concentration, a depressed mood, and poor decision-making, in addition to opining that Plaintiff was limited in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (A.R. 558, 560.) Dr. Hriso had provided Plaintiff psychiatric care on-and-off, every few months between 2003 and 2016. (A.R. 568-607.) During that visit, Dr. Hriso also noted that Plaintiff could drive and perform chores around the house. (A.R. 561.) Plaintiff returned to Dr. Hriso three times each in 2017 and 2018. (A.R. 694-95.) In September 2018, Dr. Hriso completed a mental medical assessment form indicating that Plaintiff had a current GAF of 51, manic syndrome, hyperactivity, and bipolar syndrome. (A.R. 929-30.) He further stated that Plaintiff was seriously limited in her ability to interact with the general public and unable to meet "competitive standards" with respect to understanding detailed instructions, carrying out detailed instructions, and dealing with stress. (A.R. 932.) Dr. Hriso also stated that Plaintiff had moderate restrictions in activities of daily living and maintaining social interaction, and marked limitations

in concentration, persistence, or pace.  (A.R. 933.)  According to Dr. Hriso, Plaintiff would likely be off task 25% or more per workday and probably miss up to twenty days per month of work due to her condition.  (A.R. 934.)  When asked whether alcohol or substance abuse contributed to his opinion as to limitations, Dr. Hriso did not answer.  (*Id.*)  Finally, Dr. Hriso stated that Plaintiff's psychiatric condition would exacerbate Plaintiff's physical pain.  (A.R. 932.)

In December 2016, Plaintiff attended a Social Security mental status consultative psychological examination with AnnMarie Resnikoff, Ph.D. (A.R. 628.)  Plaintiff reported that she held two bachelor's degrees, one in English literature and the other in social work.  (*Id.*)  She stated that she had worked as a waitress for twenty years, and that she stopped working in April 2016, because she had a seizure when she stopped taking the medication Cymbalta.  (*Id.*)  Plaintiff also reported a history of alcohol abuse issues while in school, and even though she had recently been hospitalized, in part for alcohol dependence and cannabis abuse in May 2016, she stated that she had been sober since May 23, 2005, with no relapses.  (*Id.*)  Plaintiff reported being under the care of a psychiatrist for thirteen years, including one week of inpatient care at Rutgers Behavioral Health, three months inpatient at PBH, and three months outpatient at Rutgers Behavioral Health. (A.R. 628-29.)  Plaintiff also explained that she returned to PBH a second time when she was supposed to attend a women's trauma program; however, she left the program because they were changing her medication and she preferred to return to the care of her psychiatrist.  (A.R. 629.)

On examination, Dr. Resnikoff found Plaintiff depressed and to have a short attention span and poor concentration.  (A.R. 629-30.)  That said, she also noted that she was pleasant, cooperative, oriented, and alert, with clear speech, and consistent eye contact.  (*Id.*)  Dr. Resnikoff found that Plaintiff had "good reality ties" and no evidence of a thought disorder.  (A.R. 630.) Plaintiff denied obsessions, compulsions, hallucinations, delusions, or current suicidal/homicidal

ideation. (*Id.*)  Dr. Resnikoff estimated Plaintiff had below average intellectual functioning, and when presented with questions that were intended to assess her social planning ability and capacity to formulate practical judgment, Plaintiff was unable to respond on a more abstract level.  (*Id.*)  Dr. Resnikoff assessed major depressive disorder recurrent and anxiety disorder unspecified.  (A.R. 631.)

Plaintiff went to Rutgers University Behavioral Health Care in July 2017, citing multiple complaints requiring treatment.  (A.R. 775.)  Specifically, Plaintiff requested a therapist, a new psychiatrist, and reported feeling agitated, anxious, and depressed.  (A.R. 776.)  Notably, she reported being prone to suicidal thoughts, explaining that she has suicidal thoughts "many times each day."  (A.R. 777.)  Despite her complaints, Plaintiff admitted that she is independent in maintaining personal appearance, household maintenance, transportation, and finances.  (A.R. 784-85.)  Plaintiff continued treatment with Rutgers Behavioral Health until October 2017 (A.R. 790-805.)

## C.     State Agency Medical Opinions

State agency physicians, Toros Shahinian, M.D., and Raymond Briski, M.D., reviewed Plaintiff's records, finding that Plaintiff did not have a severe physical impairment.  (A.R. 99-100, 132.)

State agency psychologists Cheryl Sanford, Ph.D., and Eugene Fierman, M.D., experts in social security disability evaluation, *see* 20 C.F.R. § 404.1513a(b)(1), also reviewed Plaintiff's records.  Dr. Sanford found Plaintiff had moderate limitations in mental functioning including in concentration, persistence, or pace; but that she could still maintain concentration, persistence, or pace for the performance of simple routine tasks.  (A.R. 101, 104.)  Dr. Fierman similarly found that Plaintiff had no more than moderate limitations in mental functioning including in moderate

limitations in concentration, persistence, or pace; and that she "retained the capacity for simple tasks." (A.R. 133, 137.)

### D.    Review of Testimonial Evidence

#### i.    *Plaintiff's Testimony*

At the October 23, 2018 hearing before the ALJ, Plaintiff testified that she suffers from both physical and mental impairments that prevent her from working full-time.  First, Plaintiff testified regarding her physical impairments, including asthma, chronic obstructive pulmonary disease (COPD), fatigue, and back issues.  As for her asthma and early stage COPD, she explained that it causes coughing, difficulty breathing, and an inability to walk or run long distances.  (A.R. 61.)  She also testified that she has a history of smoking; however, she claimed to have quit six months prior to the hearing.  (A.R. 61-62.)  Plaintiff testified that her symptoms became less severe since she stopped smoking.  (A.R. 62.)  Next, Plaintiff testified that she suffers from fatigue, which has "become a way of life" for her.  (A.R. 63.)  In that regard, she testified that she lacks a regular or predictable sleep pattern, making it a "chore" to do even simple tasks like laundry and making herself food to eat.  (*Id.*)  Plaintiff further explained that during these episodes of extreme fatigue, she cannot work because she takes frequent breaks or misses work entirely.  (A.R. 63-64.)  Specifically, over the course of a four or five hour shift, Plaintiff testified that she generally takes at least five breaks lasting approximately five minutes each.  (A.R. 64.)  In addition, her fatigue and other impairments have resulted in reduced attendance and availability at work, causing her to typically miss six or seven days of work per month.  (A.R. 64-65.)  Lastly, Plaintiff explained that she suffers from two herniated discs in her back, stemming from a slip and fall in her driveway in 2015.  (A.R. 69-70.)  According to Plaintiff, the herniated discs impact her ability to walk, sit, and stand for extended periods.  (A.R. 70-71.)

As for her mental health issues, Plaintiff testified about her bipolar disorder and ADHD. Plaintiff testified that she was first diagnosed with bipolar disorder at age thirty.  (A.R. 66.)  She described the disorder as "unpredictable," "painful," and "exhausting."  (*Id.*)  She further explained that although she is taking Cymbalta for her bipolar disorder, and taking the antidepressant medication as prescribed, her depression has deepened.  (A.R. 67.)  As for her ADHD, Plaintiff also described the condition as "exhausting," analogizing her thought process to a pinball machine. (A.R. 73.)

Moreover, Plaintiff provided limited testimony regarding her living arrangements, her ability to perform basic daily tasks, and her interpersonal relationships and general cognitive functioning.  She explained that she lives with her mother, she is able to drive but does not own her own vehicle, and she does only minimal food shopping.  (A.R. 76-77.)  Specifically, Plaintiff testified that "not only am I a burden to [my mother] financially, but I can't even help out around the house do, you know, cleaning the kitchen or anything like that and my room and my bathroom are -- the chaos of my mind is spilled over into my life physically and it's affecting her it's all bad."  (A.R. 77-78.)

## ii.    *Vocational Expert's Testimony*

Vocational expert Mary Vasishth (the "VE") also testified at the hearing, opining that a hypothetical individual with Plaintiff's credibly established limitations could not return to her past relevant jobs full time, but could perform several representative unskilled sedentary jobs that exist in significant numbers in the national economy.  (A.R. 81-84.)  The VE began her testimony by classifying Plaintiff's past jobs according to the Dictionary of Occupational Titles ("DOT").  (A.R. 79.)  The VE, first, classified Plaintiff's past work as a formal waitress and banquet waitress representative under DOT code 311.477-026, which has a Specific Vocational Preparation

9

("SVP") of 4, and a light exertional level.  (*Id.*)  Next, the VE stated Plaintiff's work in banquet

cleanup was classified under DOT 311.677-018 with an SVP of 2, and was a medium exertional

level occupation.  (*Id.*)  The VE then classified Plaintiff's work as a server under DOT code

311.477-030 with an SVP of 3 and light physical demand level.  (A.R. 79-80.)  The VE also

classified Plaintiff's work as a cook or head school cafeteria cook under 313.131-018 with an SVP

of 6 and a medium physical demand level.  (A.R. 80.)  Finally, the VE classified Plaintiff's work

as a pantry chef or garde manger under 313.361-034 with an SVP of 7 and a light exertional level.

(*Id.*)

     The ALJ proceeded to ask the VE the following hypothetical question:

> I'm going to ask you to assume an individual of the claimant's age, education and work experience.  For my first hypothetical, I'm going to ask you to assume that the individual would be limited to light work exertionally as defined by the regulations, with the following additional limitations.  The individual could occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; could occasionally balance; could occasionally stoop, kneel, crouch and crawl; could never -- I'm sorry, could tolerate occasional exposure to extreme cold, extreme heat, wetness, humidity or pulmonary irritants such as fumes, odors, dust, gases and poor ventilation.  The individual could understand, remember, and carry out simple routine instructions; could sustain attention and concentration over an eight-hour workday with customary breaks on simple routine tasks; could use judgment in making work-related decisions commensurate with the same type of work.  The individual would be able to adapt to changes in a routine work setting.  The individual could have occasional interaction with coworkers and supervisors beyond any increased interactions initially required to learn the job and occasional interaction with the public.  With those limitations, I take it such an individual could not perform any of the claimant's past work as you classified it?

(A.R. 80-81.)  The VE responded that Plaintiff could not do the work as described.  (A.R. 81.)  The

ALJ then asked if there were other jobs in the national economy available to Plaintiff given this

hypothetical.  (*Id.*)  The VE responded yes, and that Plaintiff could perform the work of a mail clerk, a photocopying machine operator, or a price marker.  (*Id.*)

The ALJ then asked the VE if Plaintiff would be able to perform other work in the national economy if she added to the hypothetical that the individual would be limited to sedentary work as defined by the DOT regulations.  (A.R. 82.)  The VE responded affirmatively, and that Plaintiff could perform the work of a "document specialist or preparer" or a "final assembler in optical." (*Id.*)  The ALJ then added to the first hypothetical again, asking if Plaintiff would still be able to perform the three light exertional jobs or the two sedentary jobs described by the VE if the individual could never work in tandem with coworkers in order to complete job tasks.  (*Id.*)  The VE replied that even with that addition, the individual could still work as a mail clerk, a photocopying machine operator, a price marker, a document specialist or preparer, or a final assembler.  (A.R. 82-83.)   Finally, for his fourth hypothetical, the ALJ asked, "if I were to give you any combination of limitations that included that the individual would be off task 15% or more of the workday or would be absent two or more times per month on average, would there by any work available for such an individual?"  (A.R. 83.)  In response, the VE testified that the addition of this caveat would preclude competitive employment because although an employer may tolerate such behavior for a brief period, it would not be tolerated on a sustained basis.  (*Id.*)

### E.    The ALJ's Findings

After the hearing, the ALJ issued a written decision on March 6, 2019, analyzing whether Plaintiff satisfied her burden of demonstrating disability using the standard five-step process. (A.R. 10-23.)  At step one, he found that although Plaintiff worked after the alleged disability onset date, her work activity did not rise to the level of substantial gainful activity.  (A.R. 12.)

At steps two and three, the ALJ found that while Plaintiff had certain severe impairments, including bipolar disorder, anxiety disorder, ADHD, asthma, and degenerative disc disease of the cervical and lumbar spine, those impairments did not meet or equal one of the listed impairments. (A.R. 13-15.)  Specifically, the ALJ considered Listing 1.04 in connection with Plaintiff's back impairment, noting that among other deficiencies, little evidence exists in the record showing a "compromise of a nerve root or the spinal cord with nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, [or] motor loss accompanied by sensory or reflex loss." (A.R. 13.)  As for Plaintiff's asthma, the ALJ considered Listing 3.03, finding no evidence, however, that complications from her asthma required three hospitalizations within a twelve month period.  (*Id.*)  The ALJ next considered Listings 12.04 and 12.06 in connection with Plaintiff's bipolar disorder and anxiety disorder.  There, he found little evidence that her depressive disorder is characterized by a disturbance of mood or accompanied by a full or partial manic or depressive syndrome and, with respect to Plaintiff's anxiety, that it is characterized by a predominant disturbance. (A.R. 14.)   Furthermore, the ALJ found that the Plaintiff's mental health disorders, "considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." (*Id.*)   In arriving at this judgment, the ALJ considered the four areas of mental functioning described in the disability regulations for assessing mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1), known as the "Paragraph B" criteria. (A.R. 14-15.)

The first functional area considered by the ALJ is "understanding, remember, or applying information." (A.R. 14.)  The ALJ found that Plaintiff had a moderate limitation in this area, citing the findings of state agency medical consultant Dr. Sanford and social security psychiatric consultative examiner Dr. Resnikoff.  (*Id.*) Second, the ALJ considered Plaintiff's ability to

interact with others and found that she had a moderate limitation.  (*Id.*)  Again, relying on the

findings of Dr. Sanford and Dr. Resnikoff, the ALJ cited Plaintiff's statements to Dr. Resnikoff

that she has only "limited interpersonal relationships." (*Id.*)  The third functional area considered

by the ALJ is "concentrating, persisting, or maintaining pace."  (A.R. 15.)  The ALJ found that

Plaintiff had a moderate limitation in this area, noting that she presented to Dr. Resnikoff with

issues of distractibility and a short attention span, as well as daily depression, low energy, and low

motivation.  (*Id.*) Last, the ALJ considered Plaintiff's ability to adapt and manage herself, adopting

state agency medical consultant Dr. Fierman's opinion that Plaintiff had a moderate limitation in

this area.  (*Id.*)   Accordingly, the ALJ found that because Plaintiff's mental limitations, taken in

sum, did not cause "at least two 'marked' limitations or one 'extreme' limitation," the Paragraph

B criteria were not satisfied.  (*Id.*)  The ALJ also clarified that his analysis of the four functional

categories did not constitute a RFC assessment and explained that the subsequent RFC analysis

would reflect the degree of limitation found in the Paragraph B mental function analysis.  (*Id.*)

Indeed, prior to proceeding to step four, the ALJ considered the "entire record" and set out

Plaintiff's RFC during the relevant period.  (A.R. 15-21.)  He described it as the ability to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a) and 416.967(a)
> except she could occasionally climb ramps and stairs, but could
> never climb ladders, ropes or scaffolds. She could occasionally
> balance, stoop, kneel, crouch and crawl. She could tolerate
> occasional exposure to extreme cold, extreme heat, wetness,
> humidity or to pulmonary irritants such as fumes, odors, dusts, gases
> and poor ventilation. She could understand, remember and carry out
> simple, routine instructions. She could sustain attention and
> concentration over an 8-hour workday, with customary breaks, on
> simple, routine tasks. She could use judgment in making work-
> related decisions commensurate with this same type of work. She
> would be able to adapt to changes in a routine work setting. She
> could have occasional interaction with coworkers and supervisors,
> beyond any increased interactions initially required to learn the job,
> but could never work in tandem with coworkers to complete job
> tasks. She could have occasional interaction with the public.

(A.R. 15-16.)

Finally, at steps four and five, the ALJ determined that while Plaintiff could not return to her past relevant work full time, she could perform several unskilled sedentary jobs. (A.R. 21-23.) Thus, the ALJ found that Plaintiff was not disabled under the Act. (A.R. 23.)

## II.   <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id*. at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching,

15

carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47

n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled.  *Id*.

## III.   PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff raises three challenges on appeal.  (*See*, *e.g.*, ECF No. 12, "Pl. Br.").  Plaintiff argues that the ALJ erred (1) at step two in not finding that she had severe impairments of obesity, sleep apnea, gastritis, gastroenteritis, and colitis, (2) at step three in finding Plaintiff had not satisfied the Paragraph B criteria requirements of Listings 12.04, 12.06, and 12.11, and (3) in his RFC determination.  (*Id.* at 4-37.)  The Court considers these arguments, in turn.

### A.    The ALJ's Step Two Determination

At step two of the sequential analysis, the ALJ found that in addition to the severe impairments of bipolar disorder, anxiety disorder, ADHD, asthma, and degenerative disc disease, Plaintiff suffered from fourteen medically determinable impairments, including obesity, sleep apnea, gastritis, gastroenteritis, and colitis.  The ALJ found those impairments to be non-severe, however, because they were either responsive to treatment, caused no more than minimal vocationally relevant limitations, had not lasted or were not expected to last at a severe level for a continuous period of twelve months or expected to result in death, or had not been properly diagnosed by an acceptable source.  Plaintiff argues that the ALJ erred at step two by not finding her obesity, sleep apnea, gastritis, gastroenteritis, and colitis to be severe.

#### 1.  *Obesity and Sleep Apnea*

First, the Court is not persuaded by Plaintiff's argument that the ALJ should have found her obesity and sleep apnea constitute severe impairments.  In support of her position regarding

her obesity, Plaintiff cites cases in which the claimant specifically raised problems caused by obesity during the administrative process.  For example, the plaintiff in *Diaz v. Commissioner of Social Security* asserted—and the ALJ <u>explicitly determined</u>—that the claimant's obesity constituted a severe impairment.  577 F.3d 500, 504 (3d Cir. 2009).  Further, the plaintiff in *Diaz* had been diagnosed as "morbidly obese."  *Id.*  That is not the case, here.

Rather, as the Commissioner correctly argues, this case more closely resembles *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005), in which the Third Circuit rejected similar arguments that the ALJ failed to adequately consider a claimant's obesity because the plaintiff had not suggested obesity as a severe impairment and made only a general argument as to how obesity contributed to her inability to work:

> Rutherford has not specified how that factor would affect the five-step analysis undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers. That generalized response is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments. Because her doctors must also be viewed as aware of Rutherford's obvious obesity, we find that the ALJ's adoption of their conclusions constitutes a satisfactory if indirect consideration of that condition.

*Id.* at 553.  Like the plaintiff in *Rutherford*, Plaintiff, here, did not list obesity as an impairment in her Disability Report.  (A.R. at 275.)  Rather, when asked to list "physical or mental conditions that limit your ability to work," Plaintiff identified numerous ailments, including "pinched sciatic nerve," "L4-L5 herniated," "herniated disc in neck," "arthritis in neck," "attention deficit disorder," "asthma," "borderline diabetes," "bipolar," "suicidal tendencies," and "major depressive disorder." (*Id.*)  Despite naming ten impairments, Plaintiff did not, however, identify obesity as a limiting physical condition.  Moreover, regardless of Plaintiff's failure to identify

obesity in her Disability Report, she "has not specified how [obesity] would affect the five-step analysis undertaken by the ALJ, beyond an assertion .... [of] generalized" impact." *Rutherford*, 399 F.3d at 553; *see also Santini v. Comm'r of Soc. Sec.*, No. 08-5348, 2009 U.S. Dist. LEXIS 96649 at *17, 2009 WL 3380319 (D.N.J. Oct. 15, 2009), *aff'd* 413 Fed.Appx. 517 (3d Cir. 2011) ("The problem for Plaintiff ... is that she has pointed to no medical evidence of record that her obesity has caused a substantial or relevant work-related limitation of her functioning. Absent that, the ALJ could not have come to any other conclusion ...."). Indeed, while the plaintiff in *Rutherford* at least testified that her "weight makes it more difficult for her to stand, walk and manipulate her hands and fingers," Plaintiff provided no such testimony at the hearing before the ALJ. In fact, when asked directly by her attorney at the hearing to "tell us what's preventing you from full time work," Plaintiff never mentioned her weight. (A.R. 61-78.)[2] Because the ALJ was not prompted to consider obesity, there was no reason to combine and compare this condition with other potentially severe ailments, as Plaintiff suggests. Thus, the ALJ gave sufficient consideration to Plaintiff's obesity by recognizing it simply as a medically determinable impairment, albeit not a severe impairment.

As for the ALJ's failure to identify Plaintiff's sleep apnea as a severe impairment, that argument suffers from the same fatal flaw. Again, Plaintiff did not allege sleep apnea when she filed her disability application, nor did she raise it as a limiting impairment during the hearing before the ALJ. (A.R. 275.) And, while she testified regarding "fatigue" at the ALJ hearing, the sole mention of sleep apnea in the record appears to be a nurse practitioner's "high suspicion" that

---

[2]     The Court also notes that while Plaintiff's briefing claims that she had a Body Mass Index "in the 30s," that generalization is not entirely accurate. The record reveals that while certain treatment records did show a BMI over 30, her BMI was under 30 in January 2017 and February 2018. (A.R. 839, 909.)

Plaintiff had the condition based on her subjective complaints.  (A.R. 832.)   At the time of Plaintiff's claim, however, a nurse practitioner was not an "acceptable medical source" upon which an ALJ could rely.  20 C.F.R. § 404.1502(a)(7); *see Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361–62 (3d Cir. 2011) (stating that "the ALJ was not required to consider [the nurse practitioner's] opinion at all because, as a nurse practitioner, she is not an 'acceptable medical source' "); *Favors v. Berryhill*, No. 18-234, 2019 WL 928417, at *8 (D.N.J. Feb. 26, 2019) ("[I]n fact, the ALJ was not required to consider [the advanced practice nurse's] opinion at all.") (emphasis in the original) (citing *Chandler*, 667 F. 3d at 361–62); *see also Anibal A. v. Comm'r of Soc. Sec.*, No. 20-07252, 2021 WL 5277194, at *6 (D.N.J. Nov. 12, 2021).   The Court further emphasizes that the same nurse practitioner referred Plaintiff for a sleep study to confirm her suspicion of sleep apnea, but Plaintiff never followed through with the study.   In other words, Plaintiff did not receive a medically determinable diagnosis of sleep apnea.   *See Santiago Luna v. Berryhill*, No. 16-4392, 2017 WL 4082684, at *5 (D.N.J. Sept. 14, 2017) (explaining that in cases involving disability benefits applications filed before March 27, 2017, even where a diagnosis is made, an ALJ "has no duty to accept the diagnosis of a nurse practitioner").   Consequently, the Court finds that remand is not required based on the ALJ's failure to characterize Plaintiff's obesity and sleep apnea as severe impairments.

### 2.  *Gastrointestinal Conditions*

Similarly, Plaintiff argues that the ALJ erred in failing to find that Plaintiff's numerous gastrointestinal conditions, including gastritis, gastroenteritis, colitis, diverticulosis, and irritable bowel syndrome were severe impairments.  (Pl. Br., 17-19.)   The ALJ found that like Plaintiff's obesity and sleep apnea, these conditions cause only minimal vocationally relevant limitations. Additionally, the ALJ noted that because Plaintiff's gastritis, gastroenteritis, and colitis were

diagnosed in May 2018, they did not satisfy the twelve month duration requirement set forth in 42 U.S.C. § 1382c(a)(3)(A).  Lastly, the ALJ explained that while treatment records demonstrate that Plaintiff had chronic diarrhea prior to May 2018, they also indicate that she was noncompliant with her diet for a period of time prior to that diagnosis.  Plaintiff, however, contends that the ALJ's findings are not supported by substantial evidence in the record, and that his ruling regarding the durational requirement was erroneous.  (Pl. Br., 17-19.)  I disagree.

At step two, an ALJ must assess whether a plaintiff suffers from any medically determinable impairments, or combination thereof, which severely impair Plaintiff. 20 C.F.R. § 404.1520(c).  "In effect, the inquiry at Step Two functions as a *de minimus* screening device to dismiss unfounded claims." *Bouchard v. Colvin*, No. 13-5283, 2014 WL 7011190, at *4 (D.N.J. Dec. 11, 2014) (citing *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003)).  A medically determinable impairment is one that,

> result[s] from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [Plaintiff's] statement of symptoms ....

20 C.F.R. §§ 404.1508, 416.908. According to the Commissioner's regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." *Newell*, 347 F.3d at 546 (citations omitted); 20 C.F.R. §§ 404.1520(c), 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs," including, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 C.F.R. § 140.1521(b)(1). Furthermore, and contrary to Plaintiff's contention, Plaintiff's medically determinable impairment, or combination of impairments, must have "lasted or [could] be expected to last for a continuous period of not less than twelve months" in order for her to be

considered disabled.  42 U.S.C. § 1382c(a)(3)(A).  Unrelated yet severe impairments that do not individually meet the durational requirement of twelve months cannot be tacked on to reach the Act's durational requirement.  20 C.F.R. §§ 404.1522(a), 416.922(a).

Because a plaintiff must only demonstrate more than a "slight abnormality" to satisfy the severity requirement at step two, an ALJ's decision to deny disability benefits at this step "should be reviewed with close scrutiny." *McCrea*, 370 F.3d at 360; *see also Newell*, 347 F.3d at 546 ("Only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits at step two.") (citation omitted). If there exists a reasonable doubt as to the severity of Plaintiff's impairments, it is "to be resolved in favor of the claimant." *Id.* (footnote omitted).  Here, however, the ALJ did not deny benefits at step two.  Rather, he concluded that the record contained insufficient evidence to classify Plaintiff's alleged gastritis, gastroenteritis, and colitis as severe impairments that lasted, or would be expected to last, at least twelve months.  This finding is supported by the record.    Plaintiff points to no evidence to show that her gastrointestinal issues were diagnosed prior to May 2018—only six months prior to the hearing before the ALJ—or that they continued for twelve consecutive months.  Instead, Plaintiff relies on the conclusory and unsupported position that simply based on the nature of her gastrointestinal issues, the ALJ could assume that the impairments would last longer than twelve continuous months.  (Pl. Br., 18.) Indeed, Plaintiff argues only that "the ALJ knows that [irritable bowel syndrome] and colitis are chronic digestive diseases characterized by inflammation of the inner lining of the colon[,]" and "both of these diseases are unquestionably expected to last for 12 consecutive months."  (Pl. Br., 18-19.)  Such attorney argument, advanced without any factual or medical support, does not warrant remand.  To the extent that the record shows that Plaintiff

complained of chronic diarrhea in July 2017, she also later stated that the issue only presented itself when she was "not compliant with [her] diet." (A.R. 813.)

Regardless, even if the ALJ erred in concluding that Plaintiff's obesity, sleep apnea, gastritis, gastroenteritis, and colitis did not constitute severe impairments, any such error is harmless because the ALJ concluded that Plaintiff's bipolar disorder, anxiety disorder, ADHD, asthma, and degenerative disc disease were severe impairments. *See Rosa v. Comm'r of Soc. Sec.*, No. 12–5176, 2013 WL 5322711, at *7 (D.N.J. Sept. 20, 2013) ("The Third Circuit has indicated that an ALJ's erroneous finding that some of a claimant's impairments are not severe at step two is harmless if the ALJ finds that the claimant has other severe impairments") (citing *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 145 n. 2 (3d Cir. 2007)). Accordingly, remand is not required in connection with the ALJ's step two determinations.

## B.     The ALJ's Step Three Findings

Plaintiff next challenges the ALJ's findings regarding her mental impairments at step three, arguing that the ALJ erred in concluding that her mental impairments did not meet or medically equal Listings 12.04 or 12.06, and that the ALJ erred in failing to consider Listing 12.11. Here, the Court is persuaded by Plaintiff's position, chiefly that the ALJ failed to tether his step three findings to sufficient credible medical evidence in the record and did not consider her mental impairments in combination with each other.

At step three, an ALJ considers whether the combination of the claimant's medically determinable impairments meets or equals the severity of any one of the impairments in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). An impairment meets a listed impairment if it satisfies " 'all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.' " *Jones*, 364 F.3d at 504 (quoting *Sullivan v.*

*Zebley*, 493 U.S. 521, 530 (1990)) (emphasis in original). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531 (emphasis added). "[T]he medical criteria defining the listed impairments [are set] at a higher level of severity than the statutory standard" because the "listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.' " *Id.* at 532 (emphasis in original) (quoting 20 C.F.R. § 416.925(a)).

In this case, the ALJ identified Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders), finding "little evidence" to support disability under each Listing. (A.R. at 14.) To meet Listing 12.04 or 12.06, a claimant must meet the Listing's Paragraph A criteria and, in addition, the criteria of either Paragraph B or Paragraph C. 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.04, 12.06 (2017). The Paragraph B criteria are met when a claimant has an extreme limitation of one, or a marked limitation of two, of the following four mental functional areas: the ability to understand, remember, or apply information; the ability to interact with others; the ability to concentrate, persist, or maintain pace; and the ability to adapt or manage oneself. *Id.* The Paragraph C criteria are met if the claimant's mental disorder is "serious and persistent[,]" *i.e.*, the claimant has a medically documented history of the existence of the disorder over a period of at least two years and there is evidence of both of the following: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder; and (2) marginal adjustment, *i.e.*, the claimant has minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of his or her daily life. *Id.*

While Plaintiff takes issue with the ALJ's failure to also consider Listing 12.11 (neurodevelopmental disorders) in connection with her ADHD diagnosis, I note that Listings 12.04, 12.06, and 12.11 all share the same Paragraph B criteria.

Specifically, as to Listing 12.04, the ALJ found "little evidence showing that **his** depressive disorder is characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome[.]"   Similarly, in considering Listing 12.06, he found "little evidence showing that **his** anxiety disorder is characterized by a predominant disturbance, or it is experienced if the claimant attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive disorders."  At the outset, Plaintiff correctly highlights that these seemingly templated conclusions use the incorrect pronoun to reference Plaintiff, and therefore, the Court questions whether these findings apply to Plaintiff.

Moreover, assuming that the ALJ's findings at step three are applicable to this Plaintiff, the ALJ merely adopted the findings of state agency consultants Dr. Sanford, Dr. Fierman, and Dr. Resnikoff without any explanation or discussion regarding conflicting evidence in the record.  In finding that Plaintiff's impairments did not meet the Paragraph B criteria, the ALJ concluded that Plaintiff had moderate limitations in the areas of understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; adapting or managing oneself; and interacting with others.  With respect to Plaintiff's ability to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace, the ALJ found only that:

> On July 13, 2016, State agency medical consultant Dr. Sanford (Exhibits 5A and 6A), reviewed claimant's record and opined that claimant has an affective disorder, an anxiety disorder and ADHD. Under the old "B" criteria, the doctor opined that claimant had no

25

more than moderate limitations in most areas of functioning, and only a mild limitation in the area of adapting or managing oneself.

Social Security psychiatric consultative examiner, Dr. Resnikoff found that during the interview, the claimant presented with issues of distractibility and short attention span. The doctor noted that claimant reported issues with ADHD throughout her lifetime. She reported symptoms of daily depression, low energy and low motivation (Exhibit 9F).

Therefore, I find that claimant has a moderate limitation in this area of functioning.

As for her ability to interact with others, the ALJ again relied on Dr. Sanford's review, incorporating the same paragraph as reproduced above, while also highlighting Dr. Resnikoff's finding that Plaintiff "has limited interpersonal relationships." Finally, as for the Paragraph C criteria, the ALJ's decision reasons only that he "considered whether the 'paragraph C' criteria [were] satisfied," but "the evidence fails to establish the presence of the 'paragraph C' criteria." (A.R. 15.) While the ALJ was not required to "use particular language or adhere to a particular format," nor was he expected to "make reference to every relevant treatment note in a case," he still must ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505 (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d. Cir. 2000)) (emphasis added); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). It is well-settled that this "requires more than just a conclusory statement that a claimant does not meet the listings." *Burnett*, 220 F.3d at 119.[3]

---

[3]       The Court also notes that the ALJ's decision does not appear to consider Plaintiff's mental impairments in combination with one another—a clear error. *Granados v. Comm'r of Soc. Sec. Admin.*, No. 13-0781, 2014 WL 60054, at *9 (D.N.J. Jan. 7, 2014) ("An ALJ fulfills his obligation to consider a claimant's impairments in combination with one another if the ALJ explicitly indicates that he has done so and there is no reason not to believe him.") (quotations and citation omitted). On remand, the ALJ should be mindful that consideration of Plaintiff's mental impairments in combination is mandatory under Third Circuit precedent. *Morrison ex rel. Morrison v. Comm'r of Soc. Sec. Admin.*, 268 F. App'x 186, 189 (3d Cir. 2008).

Notably, the ALJ's RFC analysis at step four summarizes substantial medical evidence relating to Plaintiff's severe mental health disorders; however, he does not explain why those records were not credited or considered at step three.  Specifically, Plaintiff's treating psychiatrist, Dr. Hriso, reported in October 2016, that symptoms of Plaintiff's bipolar disorder and ADHD include "depression,[…] irregular behavior when manic, and poor focus."  (A.R. 18.)  Dr. Hriso reported that Plaintiff has impaired concentration, a depressed mood and poor judgment related to decision-making.  (*Id.*)  Importantly, and more relevant, the doctor opined that Plaintiff has limited understanding and memory, limited sustained concentration and persistence, limited social interaction, and limited adaption abilities.  (*Id.*)  These findings were buttressed by additional reports in September 2018, when Dr. Hriso indicated that Plaintiff has difficulty thinking or concentrating, easy distractibility, and suffers from bipolar syndrome with a history of episodic periods.  (*Id.*)  Indeed, as the ALJ noted, Dr. Hriso found that Plaintiff is "seriously limited or unable to meet competitive standards in her mental abilities and aptitudes needed to do unskilled, semi-skilled and skilled work," including "marked limitations in maintaining concentration, persistence or pace."  (*Id.*)  According to Dr. Hriso, Plaintiff's mental impairments would cause her to be off task 25% or more of the workday and could result in twenty missed days of work per month.  (*Id.*)  Although the ALJ accorded "some weight" to the opinions of Dr. Hriso at step four, even noting that he is a "long-time treating physician," he stated simply, without further discussions, that the "overall record, including [Dr. Hriso's] own records, do not support the marked limitations or level of off-task work[.]" (*Id.*)

In light of the foregoing, the Court finds that the ALJ's failure to adequately explain his reasons for rejecting or discrediting conflicting evidence in finding that Plaintiff does not meet the Paragraph B criteria for Listing 12.04 or 12.06 makes that decision incapable of meaningful

judicial review. Also, since there is no discussion as to why Plaintiff's combination of impairments does not meet or medically equal a listed impairment, the ALJ's finding that Plaintiff does not have an impairment that meets a listed impairment, including Listing 12.04 and 12.06, is not based on substantial evidence. Accordingly, this Court orders that on remand, at step three, the Commissioner must re-evaluate the conflicting evidence in the record and provide a detailed analysis and explanation as to (1) why Plaintiff does not meet the Paragraphs B or C criteria of Listing 12.04 and 12.06, and (2) why Plaintiff's combination of mental impairments does not meet or medically equal a listed impairment.

### C.    The ALJ's RFC Determination

Because the ALJ's decision on remand may make consideration of steps four and five of the sequential evaluation unnecessary, the Court does not reach Plaintiff's remaining challenge with respect to the ALJ's RFC determination. *See*, *e.g.*, *Vivaritas v. Comm'r of Soc. Sec.*, 264 Fed.Appx. 155, 157 (3d Cir. 2008). That said, I underscore this Court's recent decision in *Carratura v. Saul*, No. 20-05483, 2021 WL 4077565, at *1 (D.N.J. Sept. 8, 2021) to guide any future RFC determination in this case. Relying on *Curry v. Comm'r of Soc. Sec.*, No. 15-07515, 2017 WL 825196, at *4 (D.N.J. Mar. 2, 2017), I remanded an ALJ's decision denying disability benefits because the ALJ failed to properly consider the plaintiff's mild to moderate impairments in the RFC analysis. *Carratura*, No. 20-05483, 2021 WL 4077565, at *6-7. There, like here, the ALJ found that the plaintiff suffered certain moderate mental impairments at step two of the analysis. *Id.* However, in conducting the subsequent RFC analysis, the ALJ made only a "passing reference to the medical evidence regarding [the plaintiff's] mental health." *Id.* (citation omitted). Indeed, I emphasized that the ALJ never addressed how the plaintiff's moderate mental limitations, such as his difficulties understanding, remembering, or applying information or his difficulties

interacting with others, might impact his prior work.  *Id.*  Thus, following *Curry*, I found remand appropriate such that the ALJ could properly consider how the plaintiff's mental impairments might impact his RFC and his capability to perform past relevant work.  *Id.; see also Balla v. Comm'r of Soc. Sec.*, No. 18-00386, 2019 WL 2482661, at *3 (D.N.J. June 14, 2019) (remanding to the ALJ because she did not "explain the 'impact of [the] Plaintiff's mental impairments on her ability to' complete the relevant work"); *Engle v. Berryhill*, No. 17-2185, 2019 WL 1003597, at *4 (M.D. Pa. Mar. 1, 2019) (holding that substantial evidence did not support the RFC and remanding because "the ALJ's decision is not clear whether the ALJ gave full consideration to plaintiff's mental impairments and whether he adequately accounted for them in determining her symptoms and her RFC"); *Kich v. Colvin*, 218 F. Supp. 3d 342, 359 (M.D. Pa. 2016) (holding that substantial evidence did not support the RFC, and remanding because the ALJ provided no explanation as to why he excluded from the RFC any limitations related to the claimant's mild mental limitations).  Because Plaintiff's mental impairments are critical to Plaintiff's disabled status under the Act, on remand the ALJ should be mindful of the principles set forth in *Curry* and *Carratura* in crafting Plaintiff's RFC.  Indeed, as I explained in *Carratura*, "simply having non-severe, mild or moderate mental limitations does not necessarily indicate that Plaintiff could perform [her] past relevant work at the calculated RFC."  2021 WL 4077565, at *7.

## IV.   **CONCLUSION**

For the reasons set forth above, the Court will **REMAND** this matter to the Commissioner for further consideration consistent with this Opinion.  An appropriate Order shall follow.

Dated: January 18, 2022                                   /s/ Freda L. Wolfson
                                                          Hon. Freda L. Wolfson
                                                          U.S. Chief District Judge